UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JAMES L. GERODEMOS, | Case No. 2:26-CR-0069-GSL-APR |

## OPINION AND ORDER

This matter is before the Court on the Motion for Stay of Release Order and for Review and DeNovo Hearing of Magistrate's Decision to Release James Gerodemos on Bond [DE 361] filed by the Government on September 28, 2026. Defendant, James Gerodemos, responded [DE 363] on September 30, 2026, and the Government replied [DE 367] on October 2, 2026. A hearing was held on this Motion on October 21, 2026. [DE 383]. For the reasons set forth below, the Court **GRANTS** the Motion.

## BACKGROUND

On April 16, 2026, a federal grand jury returned a twenty-eight count Indictment against James Gerodemos (hereinafter referred to as "J. Gerodemos") and twenty-one other individuals stemming from the alleged operation of an illegal Gambling Organization. [DE 1]. The Indictment charges J. Gerodemos with the following:

**Count 1**: Illegal Gambling Business 18 U.S.C. § 1955
**Count 2**: Conspiracy - Hobbs Act Extortion 18 U.S.C. § 1951
**Count 3**: Conspiracy - Collection of Extensions of Credit by Extortionate Means 18 U.S.C. § 894
**Count 4**: Hobbs Act Extortion 18 U.S.C. § 1951
**Count 5**: Collection of Extensions of Credit by Extortionate Means 18 U.S.C. § 894
**Count 6**: Conspiracy - Hobbs Act Extortion 18 U.S.C. § 1951

> **Count 7**: Conspiracy - Collection of Extensions of Credit by Extortionate Means 18 U.S.C. § 898
> **Count 8**: Hobbs Act Extortion 18 U.S.C. § 1951
> **Count 9**: Collection of Extensions of Credit by Extortionate Means 18 U.S.C. § 894
> **Count 10**: Hobbs Act Extortion 18 U.S.C. § 1951
> **Count 11**: Collection of Extensions of Credit by Extortionate Means 18 U.S.C. § 894
> **Count 12**: Hobbs Act Extortion 18 U.S.C. § 1951
> **Count 13**: Collection of Extensions of Credit by Extortionate Means 18 U.S.C. § 894
> **Counts 14-16**: Conspiracy to Commit Money Laundering 18 U.S.C. § 1956(h)

[DE 1].

J. Gerodemos was arrested, in relation to the above-described charges, on April 29, 2026. [DE 60]. His initial appearance was held before Magistrate Judge Andrew P. Rodovich (hereinafter referred to as "Judge Rodovich") on the same date. [DE 38]. The Government moved to detain J. Gerodemos pending trial. [DE 116, 139]. On May 4, 2026, J. Gerodemos stipulated to pretrial detention, reserving his right to contest the issue at a later date. [DE 129-130].

Four months later, on September 2, 2026, J. Gerodemos filed a Motion for Release [DE 326]. In his request for pretrial release, J. Gerodemos argued that his continued detention was not justified under the Bail Reform Act because a combination of conditions exist that are sufficient to protect the public and ensure his appearance in court. [DE 326]. The Government strongly opposed the existence of such conditions. *See generally* [DE 338, 347]. A contested detention hearing was held before Judge Rodovich on September 22, 2026. [DE 353].

### A. September 22, 2026 Detention Hearing

At the September 22, 2026 hearing, Judge Rodovich found, in pertinent part, as follows:

> Addressing the crime of violence first, if this is a crime of violence under [18 U.S.C. 3142(f)(1)(A)], the government is entitled to the presumption. In reviewing Judge Lund's Order in the companion case … as well as reviewing the Taylor Case, *United States v.*

> *Taylor*, 596 U.S. 845, decided by the Supreme Court in 2022, I do not believe that the charges contained in the Indictment constitute a crime of violence.
>
> Turning to the obstruction issue. I am required to consider whether [J. Gerodemos] is a threat to obstruct justice in the future. Obviously, I can consider past conduct. But, as I said in previous detention orders, it is clear to all defendants in this case that the government's investigation was thorough, and I believe that any defendant who attempts in any way to influence or intimidate any witnesses has to know that the government will find out and will be facing new and additional charges.
>
> ***
>
> In considering the various risks of flight that [J.] Gerodemos has, I am prepared to set a $ 5 million unsecured bond if his wife, Violet, signs, surrenders her passport, if his daughter, Athena, signs, she's already surrendered her passport, and if his son, Louis, signs and surrenders his passport. In addition to that, the usual terms and conditions of electronic monitoring and home incarceration.

[DE 354 at 31-32].

At the hearing, counsel for J. Gerodemos assured the court that J. Gerodemos' wife, daughter, and son would sign the sureties "in short order" and that he "d[id] not need anytime" as he "kn[ew] they would sign as sureties [with] [t]he one caveat [] that Louis suffers from autism[] and is nonverbal." [DE 354 at 32].

The Government immediately moved to stay the court's decision to release J. Gerodemos for five days so that it could appeal the release order to the district court. [DE 354 at 34]. Judge Rodovich ruled that J. Gerodemos was to remain in custody pending this Court's decision on the Government's request for stay. [*Id.* at 35].

### B. Government's Motion for Stay of Release and DeNovo Hearing

The Government filed the instant motion requesting a denovo bond hearing by the District Court, including a request for immediate stay of Judge Rodovich's release order, on September 28, 2026. [DE 361]. This Court granted the Government's motion in part. [DE 364]. Specifically,

it ordered that Judge Rodovich's release order was stayed pending its review of the release order pursuant to 18 U.S.C. § 3145(a). [*Id.*]. The Court took under advisement the issue of § 3145(a) release review pending a de novo bond hearing. [*Id.*]. The hearing took place before this Court on October 21, 2026. [DE 383]. The Court also ordered U.S. Pretrial Services to file an updated Pretrial Bond Report ahead of the hearing. [*Id.*].

On October 7, 2026, Pretrial Services filed the updated Pretrial Bond Report wherein it represented to the Court that:

> [J. Gerodemos] daughter/co defendant, Athena Gerodemos, has expressed objection to the defendant's release to the home stated above. Athena is currently on pretrial supervision with this officer, and she advised that she did not agree to sign a surety bond for the defendant's release.
>
> ***
>
> On October 5, 2026, this officer spoke with Violet regarding the defendant's release plan to the home on Turnberry Drive. She relayed that due to her daughter Athena's pending case, she does not believe this home would be an appropriate residence.

[DE 371 at 2]. To date, the bond conditions set out by Judge Rodovich, have not been satisfied.

### C. The Government's Request for Detention

As stated above, the Government originally moved to detain J. Gerodemos shortly after his arrest in May 2026. [DE 116]. Although J. Gerodemos originally stipulated to detention, the Court draws upon all of the filings in the record related to the issue of detention when analyzing the issue of detention in this case. *See* [DE 16, 326, 338, 347, 349, 351, 361, 363, 367, & 376].

The Government has remained steadfast in its position that pretrial detention is warranted in this case because J. Gerodemos is a danger to the community, as his release poses a serious risk that he will attempt to obstruct justice or threaten, injure, or intimidate a prospective witness or juror. The Government also argues that J. Gerodemos poses a risk of flight if released, and that there are no available conditions or combination of conditions to mitigate these risks. They

maintain that he is one of the leaders of a large ranging illegal gambling organization spanning numerous states and has allegedly used extortion and threats to collect winnings. [DE 116 at 7].

*Danger to the Community*

As to the danger factor, the Government maintains that the court should consider a pattern of past threats as being indicative of future threats when determining whether a defendant poses a risk of danger to others. [DE 361 at 13]. The Indictment identifies several victims of J. Gerodemos' alleged criminal activity, with "the most egregious acts of extortion involv[ing] J. Gerodemos … contacting Victim 1's daughter on numerous occasions and issued threats ranging from paying her a visit[] to [] threatening to rape her if Victim 1 did not pay." [DE 116 at 8]. Victim 1 was a bettor with the alleged illegal gambling organization that J. Gerodemos sought to collect debts from through, what the Government alleges to be, extortionate means. [DE 116 at 12]. The evidence supporting the Government's position consists of numerous phone calls, text messages, and voicemails allegedly left for Victim 1, his wife, and his daughter by, or at the direction of, J. Gerodemos, during December 2024 through August 2025. *See generally* [*Id*. at 12-20].

On March 8, 2025, the Government asserts that J. Gerodemos left the following voicemail for Victim 1's Daughter:

> []I'm looking for your dad [] give me a call I might stop out to see you tomorrow … I'll come and see you tomorrow[.]

[DE 338 at 4]. The March 8, 2025 voicemail was transcribed and depicted in a screenshot taken from Daughter's phone. [*Id*.].

The Government further alleged that J. Gerodemos left a voicemail for Victim 1's Daughter the following day, March 9, 2025:

> See you soon sweetheart. See you soon …

[DE 338 at 4]. This voicemail was also transcribed and depicted in a screenshot taken from Daughter's phone. [*Id.*]. These calls and voicemails to Victim 1, his wife, and his daughter allegedly continued for months. [DE 116 at 18-20]. On October 9, 2025, J. Gerodemos left a voicemail for Victim 1 stating:

> "[Victim 1]. [Victim 1], give me a call man. Give me a call. I'm gonna go to Valparaiso and fuck your daughter."

[DE 116 at 20]; *see also* [*Id.* at 19] (explaining that, at all relevant times, Victim 1's daughter was enrolled at Valparaiso University).

The Government's evidence concerning Victims 2, 3, and 4 is similar in that it involves a slew of text messages, phone calls, and voicemails, some more flagrant than others, from J. Gerodemos to the victims in an effort to get them to pay the debts they allegedly owed to the gambling organization. *See* [DE 116 at 20-39]. On August 17, 2024, J. Gerodemos texted Victim 2:

> You're [sic] wearing me down its about to come to an end my friend.

[DE 116 at 24]. On October 30, 2024, J. Gerodemos sent several text messages to Victim 2, stating:

> I hope your [sic] mother dies of cancer[.]
>
> I just lit a candle in New York I hope your [sic] mother dies I pray she dies of cancer and all your [sic] children's[.]
>
> I pray your [sic] child dies of cancer! Then we're even if god answers my prayers!!!
>
> I'm in New York I just spend 300 on candles I hope your [sic] whole family dies of cancer then we're even your [sic] a no good motherfucker[.]

[DE 361 at 20-21]. The text messages were followed by a video to Victim 2 from J. Gerodemos of the aforementioned lit candles. [*Id.* at 22].

On July 10, 2024, J. Gerodemos texted Victim 3 saying:

> I had a dream your [sic] mother died … When she dies I'll dig her up and fuck her in the ass!!

[DE 116 at 31]. Around the same time, J. Gerodemos texted Victim 4:

> I heard your [sic] mother died good!
>
> I'm so glad your [sic] mother died …I wanted to dig her up and fuck her[.]

[DE 116 at 32].

Also, on the risk of danger that J. Gerodemos' release would pose to the community, the Government highlighted what they refer to as the "swatting incident". [DE 361 at 23]. In February 2025, J. Gerodemos was charged in Lake County for the "swatting incident" that took place on May 5, 2024. [*Id.*]. The probable cause affidavit supporting the charges explain that J. Gerodemos called 911 and falsely reported that a man was holding a woman at gunpoint in a parking lot outside of Southlake Mall in Hobart, IN. [*Id.* at 24]. Police responded to the scene where they ordered the male and female outside of the vehicle and handcuffed them. [*Id.*]. The male and female indicated that they were just friends, no argument had occurred, and that no weapons were present. [*Id.*]. Per the affidavit, the female requested public records to listen to the 911 call and was able to identify the caller as J. Gerodemos, whom she explained that she had previous legal dealings with which ended contentiously. [*Id.*]. The Government argues that this conduct shows J. Gerodemos' contempt for the legal system and willingness to use it to his advantage despite who may be endangered in the process. [*Id.* at 25].

Lastly, the Government presents text messages between J. Gerodemos and co-defendant, Michael Campbell, where J. Gerodemos appears to be attempting to infleunce Campbell to threaten Victim 2. [DE 367 at 17]. Campbell's responses include:

> My freedom is worth more than 5800[.]
>
> I'm not gonna get in trouble when this guy goes to the feds that's not fair to me[.]
>
> You shouldn't put me in that position man[,] be a friend[.]
>
> Come one man be smart don't put me in that position. I'll do anything for you, but I'm not gonna get you or me in trouble.

[DE 367 at 17-20].

*Flight Risk*

In addition to being a danger to the community, if released pending trial, the Government argues that J. Gerodemos poses a risk of flight and nonappearance in this Court. [DE 361 at 8]. The Government contends that J. Gerodemos' ties to Greece, specifically his eligibility for Greek citizenship, family property in Greece, and his recent visit to Greece that included a "dinner with Frank Kilinttzas, a decade plus fugitive [of this district]." [*Id.*]. The Government also points to J. Gerodemos' available finances as support for his likelihood of fleeing. [*Id.* at 9-12].

The Government's filings indicate that J. Gerodemos' father owns land in Greece. [DE 361 at 8]. The Government also alleges that J. Gerodemos' "large-scale gambling operation [] gross[ed] millions of dollars … [including] Superbowl line-pool cards [that] grossed between $700,000.00 and $900,000.00 annually." [*Id.* at 9]. They maintain that these resources support his ability to flee if given the opportunity.

Additionally, the Government argues, text messages between J. Gerodemos and his wife from January 2024 regarding the purchase of property in Greece as well as appointments made with the Greek Embassy to obtain Greek citizenship support the possibility of his flight if released on pretrial supervision. [DE 367 at 8-10]. Text messages from March 2024 show conversations between J. Gerodemos and his wife about going to the consulate in Greece as well as "claim[ing] living expenses in Greece as a [way to obtain] tax credit in [the] [United States]." [*Id.* at 9].

Finally, there are text messages dated from August 2024 between J. Gerodemos and his daughter, sister, and a person identified as "John" regarding obtaining property or plots of land in Greece as well as a message appearing to confirm the ownership of property in Greece. *See generally* [*Id*. at 10-16]. J. Gerodemos' daughter sent a message indicating that " … [w]e have property in Anavyssos we want to build a villa on[.]" [*Id*. at 16].

**LEGAL STANDARD**

When a magistrate judge orders a defendant released pending trial, the attorney for the Government may file a motion for revocation of the order or amendment of the conditions of release; and … [t]he motion shall be determined promptly. 18 U.S.C. 3142(a)(1).

When a defendant is charged with a criminal offense, they may be released on personal recognizance, temporarily detained, or detained. 18 U.S.C. § 3142(a). Detention is appropriate where there is no condition or combination of conditions that will reasonably assure the defendant's appearance in court and the safety of the community. *Id.* § (e)(1).

The Bail Reform Act creates several evidentiary presumptions to be employed in certain cases, when determining what (if any) release conditions are appropriate. *United States v. Dominguez*, 783 F.2d 702, 706 (7th Cir. 1986). The Act lists specific offenses that, if certain circumstances are present, carry a presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community. *Id.* at § (e)(2)-(3). The presumption shifts the burden of production to the defendant to come forward with some evidence that, if released, he would not flee or endanger the community. *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985). The burden is not heavy, as any evidence favorable to a defendant that comes within a category listed under § 3142(g) will suffice. *See United States v.*

*Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986). Even if rebutted though, the presumption remains in the case as an evidentiary finding militating against release. *Id.*

When the presumptions are found inapplicable, the government bears the burden of persuasion, *United States v. Wilks*, 15 F.4th 842, 846-47 (7th Cir. 2021); *Dominguez*, 783 F.2d at 706–07, and must prove either by clear and convincing evidence that the defendant, if released, presents a danger to the community or by a preponderance of the evidence that the defendant, if released, poses a risk of flight. *Portes,* 786 F.2d at 764–65. And, further, there is no condition or combination of conditions that mitigates those risks. *Id*.

In making a detention determination, the Court looks at the following:

> (1) the nature and circumstances of the offense charged, including whether the offense involved a controlled substance, firearm, explosive, or destructive device;
> (2) the weight of the evidence against the defendant;
> (3) the history and characteristics of the defendant, including
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> (B) whether, at the time of current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and
> (4) and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.

§ 3142(g).

## DISCUSSION

### A. Standard of Review

The Seventh Circuit explains that, under 18 U.S.C. § 3145(b), district courts have the option to either hold a new hearing on the issue of detention or review the record of the proceedings before the magistrate judge. *See United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991); *United*

*States v. Bruma*, 2025 WL 1036543, at *1 (N.D. Ind. Apr. 8, 2025). If the district court decides to hold a new hearing, its review is considered "*de novo* since it must make an independent determination of the proper pretrial detention or conditions for release." *Bruma*, 2025 WL 1036543, at *1. As explained above, the Court is considering the issue of detention *de novo*, meaning it will determine whether pretrial release is warranted based on the evidence and argument presently before it.

**B. The Bail Reform Act's Rebuttable Presumptions**

Before determining the issue of detention, the Court must first decide whether the Bail Reform Act's rebuttable presumptions apply. Section 3142(e)(2) creates a rebuttable presumption in cases where the offense charged is one listed in § 3142(f)(1) *and* the defendant was previously convicted of a qualifying federal or state offense; the offense was committed while the defendant was on bond pending trial; and no more than five years have passed since the conviction or release from imprisonment for that offense. § 3142(e)(2)(A)-(C). [1]

The Government, when originally moving to detain J. Gerodemos, argued that the presumption was applicable because Hobbs Act extortion is considered a crime of violence for purposes of § 3142(f)(1)(A). In the instant motion, however, the Government appears to pull back slightly explaining that while they "believe" the charges J. Gerdemos is currently facing "may be" crimes of violence for purposes of the rebuttable presumption, "pretrial detention can also be sought pursuant to 18 U.S.C. § 3142(f)(2)."[2] [DE 116 at 4-6]; [DE 361 at 6]. J. Gerodemos has

---

[1] The Court notes that § 3142(e)(3) provides a list, different from those listed in § 3142(f)(1), of certain types of offenses, that if charged, trigger a rebuttable presumption. The Government does not appear to be moving under this presumption neither now nor in the past.

[2] 18 U.S.C. § 3142(f)(2) explains that pretrial detention can be sought "upon motion of the attorney for the Government … in a case that involves (A) a serious risk that such person will flee; or (B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror."

argued at length, that the Bail Reform Act's presumptions are inapplicable, and particularly that J. Gerodemos is not charged with a crime of violence. *See* [DE 363 at 4].

The Court does not find it necessary to entertain the applicability of the presumption in this case, because as explained in detail below, the Government has furnished evidence sufficient to prove, even without the benefit of the presumption, by clear and convincing evidence that J. Gerodemos, if released, presents a danger to the community *and* it has shown by a preponderance of the evidence that he, if released, poses a risk of flight. And, further, there is no condition or combination of conditions that mitigates those risks.

**C. § 3142(g) Factors**

As stated above, when not moving pursuant to the rebuttable presumption, the burden is on the Government to show either, by a preponderance of the evidence, that no condition or combination of conditions will reasonably assure J. Gerodemos' appearance in this Court *or* by clear and convincing evidence that no condition or combination of conditions reasonably assures the safety of the community. § 3142(f)(2).

*Nature and Circumstances of the Offense*

The first factor a court must consider is the nature of the offense that a defendant is charged with committing, including whether the offense is a crime of violence or involves a narcotic drug. *See* 18 U.S.C. § 3142(g)(1). J. Gerodemos has been charged with several crimes related to the alleged operation of an illegal gambling organization. [DE 1]. Some of the charges involve collecting, and conspiracy to collect, extensions of credit by extortionate means. [DE 1]; 18 U.S.C. § 3142(g)(1). Evidence supporting these charges that display threatening behavior by J. Gerodemos, include threats to visit and rape Victim 1's Daughter and wishes of death upon the family members of Victims 2, 3, and 4. [DE 116 at 19-20, 31-31]; [DE 361 at 20-21].

While the Court refrained from pursuing an inquiry as to whether the charged conduct in this case constitute a crime of violence for purposes of the Bail Reform Act, the Court notes that the statute defines a crime of violence as an "offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 3156(a)(4). A threat to rape Victim 1's Daughter if Victim 1 does not pay a gambling debt could certainly imply that there is a substantial risk that Victim 1's Daughter may be raped in the course of J. Gerodemos' collection of Victim 1's debts.[3] To the extent that this factor is germane to this case, it favors detention.

*Weight of the Evidence*

The Government represents that it has substantial evidence to support the charges contained in the Indictment. That evidence includes hours of recordings made by an undercover officer, 15 terabytes of backup data from phones recovered during search warrants, call log records, bank records revealing financial dealings between defendants, victims, and bettors in this case, and phone recordings of J. Gerodemos. [DE 116 at 9]. In support of the issue of detention, the Government has provided the Court with numerous voicemail recordings and text messages supporting the charges.

While understanding that a "pretrial detention decision may incorporate some consideration of the accused's guilt, a pretrial detention decision should not effectively prejudge the merits." *United States v. Lewis*, 2023 WL 4351244, at *1 (7th Cir. 2023). Here, the weight of the evidence is robust, tipping this factor in favor of detention.

---

[3] The crime of Interference with Commerce by Threats or Violence occurs when "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion or attempts or conspires so to do, or commits or *threatens physical violence to any person* or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a).

*History and Characteristics*

This factor requires the Court to assess a defendant's character, physical and mental condition, family ties, employment, financial resources, criminal history, community ties, and more. It also instructs the Court to consider whether, at the time of the current offense or arrest, the defendant was on probation, parole, or other release pending trial. 18 U.S.C. § 3142(g)(3).

J. Gerodemos is 63 years old and has resided in northwest Indiana his entire life. [DE 76 at 2]. He is married with two adult children, one of which is Athena Gerodemos, a co-defendant in this case. [*Id.*]. J. Gerodemos' two sisters and one brother also reside in Northwest Indiana. [*Id.*].

J. Gerodemos has owned or worked for various restaurants for the majority of his life. [DE 76 at 3]. He has owned Gino's Restaurant in Merrillville, IN for the last 12 years. [*Id.*]. However, the restaurant has since closed due to the commencement of the instant case. Prior to his arrest, his reported monthly income was $9,500.00 with an estimated net worth of $1.5 million. [*Id.*].

J. Gerodemos reports to be good physical and mental health with no known alcohol or substance use disorders. [DE 76 at 3]. His criminal history includes a federal conviction for Dealing in Explosive Material Without a License for which he served a 6-month prison sentence for. [DE 76 at 4]. He also was charged in Lake County for the swatting event described above but that resulted in a diversion agreement and was ultimately dismissed in April 2026. [*Id.*].

The Government argues that J. Gerodemos' history and characteristics support the notion that he is a flight risk. They rely on J. Gerodemos ties to Greece, including land owned by his father in Greece, inquiries made by J. Gerodemos to purchase property there as well as appointments made with the Greek Embassy, which the Government contends was for obtaining

citizenship or a Greek passport. [DE 361 at 9]. The Government also points to J. Gerodemos' financial ability to flee if given the opportunity in support of detention in this case. [*Id*. at 10].

J. Gerodemos argues that the Government's basis for arguing that he is a flight risk "relates largely to the fact that [he] is Greek Descent." [DE 363 at 11]. He claims that he has no intention of obtaining Greek Citizenship, and that the Government has offered no evidence of his "attempting to [do so] or ever discussing [it]." [*Id*.]. The text message evidence clearly belies this argument. J. Gerodemos has clearly shown an interest in obtaining property in Greece and, his daughter has even represented, in a text message, that they do own property there. *See* [DE 116 at 19-20, 31-32]; [DE 361 at 20-21]. Additionally, text messages indicate that J. Gerodemos either had an appointment or was planning to make an appointment with the Greek Embassy. [*Id*].

J. Gerodemos also argues that his recent trip to Greece, and voluntary return, contradicts the Government's argument that he is a serious flight risk. He claims that "… he could have stayed in Greece if he intended to flee. But he did not. He returned, surrendered his passport, and is submitting to these proceedings." [DE 363 at 12]. The Court gives this argument little weight, as his trip to Greece predated his arrest in this case. *See* [DE 361 at 8] (explaining that during J. Gerodemos recent trip to Greece, he was pictured eating dinner with Frank Kilintzas, a fugitive who fled to Greece after being sentenced for public corruption offenses in this district in 2005).

Notwithstanding, the relevant inquiry is whether there are any conditions that could reasonably assure J. Gerodemos' appearance in this Court. The Court agrees with the Government, J. Gerodemos' history and characteristics support the likelihood that he is a flight risk. The evidence supports that he has the means, ties, and interest to flee if given the opportunity. The weight of the evidence and the seriousness of the offenses charged in this case also support the conclusion that he is a risk, as the quantum of evidence is overwhelming and penalties if convicted

are substantial. *See United States v. Diaz*, 777 F.2d 1236, 1238 (7th Cir. 1985) (explaining that facing a lengthy prison sentence is "likely to make anyone think of fleeing, especially if he is likely to be convicted[.]"). On that point, while it appears that he complied with court orders related to his previous federal conviction, the penalties he faced there, and were ultimately given, were minimal.

As mentioned above, J. Gerodemos was unable to satisfy the previously imposed conditions of bond, as neither his wife nor his daughter were willing to sign as sureties for his bond. His suggestion that his elderly parents act as sureties instead is not a condition of bond that this Court finds reasonable. His father is 87 years-old and owns land in Greece. Accordingly, the Court finds that the Government has met its burden in proving by a preponderance of the evidence that no condition or combination of conditions will assure J. Gerodemos' appearance in this Court.

*Nature and Seriousness of the Danger to the Community*

Finally, the Court must consider the nature and seriousness of the danger to any person or the community posed by J. Gerodemos' release. 18 U.S.C. § 3142(g)(4). As discussed at length above, the Government has supported their position that J. Gerodemos' release poses a serious risk of danger to the community with text messages and voicemails of threats J. Gerodemos sent to alleged victims in this case. They also argue that those communications along with the swatting incident shows his willingness to obstruct justice and threaten, injure, or intimidate a prospective witness or juror. [DE 361 at 13-27].

J. Gerodemos, however, argues that while the Government asserts that he has previously threatened victims, it has not offered any evidence that he would threaten witnesses in connection with this case now that he has been indicted. In other words, he argues that the Government has

failed to meet its burden of establishing that he presents a serious threat of future obstruction or witness intimidation in connection with this case. [DE 363 at 14].

When analyzing the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release, courts are cautioned to engage in a forward-looking analysis. *U.S. v. Cantlon*, 2026 WL 2581829, at * 3 (Sep. 1, 2026) (*citing* Dominguez, 783 f.2d at 707). With that being said, "an arrestee's past conduct is essential to an assessment of the danger he poses to the public, and this will inform a court's determination whether the individual should be released on bail." *Maryland v. King*, 569 U.S. 435, 453 (2013). For the "plain, spacious terms [of] the [Bail Reform] Act require[] a complete examination of all facets of a defendant's history and character … [and] [p]ast behavior is often prologue and is proper predictive criterion to be employed in determining whether a person will abide by his or her present promises." *U.S. v. Fattah*, 351 F.Supp.3d 1133, 1137, 1140 (N. D. Ill. 2019).

The evidence before the Court displays J. Gerodemos unrelenting attempts to threaten individuals in an effort to collect debts allegedly owed to him. *See generally* [DE 116 at 12-32]; [DE 338 at 4]. And importantly, J. Gerodemos does not dispute that he was the author of the previously described text messages, instead he only disputes the threatening nature of them. *See* [DE 363 at 15] (arguing that "[w]hile disrespectful, [the text messages] [were] absolutely not a threat of violence … [and] [w]hile inflammatory, the cited text messages do not show anything resembling a substantial risk that, after indictment, [J.] Gerodemos would engage in efforts to threaten or intimidate witnesses"). While the Court is keenly aware of its obligation to engage in a forward-looking analysis here, it is fair to conclude that "past is prologue" in this case.

Additionally, J. Gerodemos' involvement in the "swatting event" is a cause for concern as it displays his disregard for law enforcement resources and a willingness to create chaos, putting

others in harm's way. J. Gerodemos' argument that it was only "a prior misdemeanor offense" does not minimize the impact it had on the community. On a similar note, the "disrespectful" nature of the messages that J. Gerdemos sent to victims are more than alarming and give the Court some insight into his questionable thought-process.

The foregoing review of the statutory factors under the Bail Reform Act leads this Court to the conclusion that J. Gerodemos is not entitled to bond. The Government has shown by a preponderance of the evidence that no condition or combination of conditions will ensure J. Gerodemos' attendance in this Court. They have further successfully shown, by clear and convincing evidence, that a denial of bond is required here to ensure the safety of the community, and that no conditions or combination of conditions will mitigate this.

## CONCLUSION

The Court hereby **GRANTS** the Government's Motion for Stay of Release Order and for Review and DeNovo Hearing of Magistrate's Decision to Release James Gerodemos on Bond [DE 361]. J. Gerodemos is to remain detained pending the outcome of this case.

SO ORDERED.

ENTERED: November 24, 2026

/s/ GRETCHEN S. LUND
Judge
United States District Court